IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SUMNER COUNTY BOARD OF )
EDUCATION, )
 )
    Plaintiff / Counter-Defendant, )
 )
v. )    Case No. 3:18-cv-00613
 )    Judge Campbell / Frensley
L.D., a minor student, by and through his )
parents, C.K. and A.K., individually, )
 )
    Defendants / Counter-Plaintiffs. )

## REPORT AND RECOMMENDATION

### I.  Introduction and Background

This matter is before the Court upon a Motion for Partial Judgment on the Pleadings filed

by Plaintiff / Counter-Defendant Sumner County Board of Education ("Plaintiff" or "SCBOE").

Docket No. 42.  Along with its Motion, Plaintiff has contemporaneously filed a supporting

Memorandum of Law with Exhibits, including Defendants' March 2017 Due Process Complaint,

Defendants' June 2017 Due Process Complaint, Plaintiff's Motion to Dismiss or, Alternatively,

to Consolidate Petitioners' Complaints filed by Plaintiff at the administrative level, the

Administrative Law Judge's Order consolidating Petitioners' Complaints, and the Affidavit of

Norma Dam.  Docket Nos. 43 - 43-5.

Defendants / Counter-Plaintiffs ("Defendants") have filed a Response in Opposition to

the instant Motion.  Docket No. 46.  Attached to their Response, Defendants have submitted two

cases: one from California and one from Tennessee.  Docket Nos. 46-1, 46-2.

With leave of Court (Docket No. 47), Plaintiff has filed a Reply (Docket No. 49).

Plaintiff filed this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1401 *et seq.*, 34 C.F.R. Part 300, and the Rules of State Board of Education 0520-01-09, seeking review and reversal of the decision of Administrative Law Judge ("ALJ") Steve R. Darnell ordering SCBOE to reimburse C.K. and A.K. for the expenses incurred on behalf of L.D. for his placement in Illuminate Academy for the 2017-18 school year, as set forth in the ALJ's Final Order entered June 28, 2018. Docket Nos. 1, 1-2.

Defendants have filed counterclaims in this action arguing that the ALJ's Final Order is incomplete with respect to the findings and relief granted, and seeking to compel the relief outlined in the ALJ's Final Order entered June 28, 2018, along with declaratory and injunctive relief, compensatory damages, attorneys fees and costs, several Court Orders, and any other relief the Court deems appropriate. Docket No. 19, pp. 12-45.

Plaintiff argues in the instant Motion that it is entitled to judgment on the pleadings as to Defendants' claims regarding systemic violations, claims regarding the March 2017 proposed Individual Education Program ("IEP"), claims regarding the use of restraints and isolation, claims pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and claims pursuant to Title II of the Americans with Disabilities Act ("ADA") on the following grounds: (1) lack of standing; (2) lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and 12(h)(3) and/or failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and 12(h)(2) based upon Counter-Plaintiffs' failure to exhaust the required administrative remedies; (3) mootness; (4) failure to state a claim for which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6) and the IDEA, 34 C.F.R. § 300.513(a); and (5) statute of limitations. Docket Nos. 42, 43.

Defendants respond that Plaintiff is not entitled to a judgment on the pleadings on the claims sought. Docket No. 46. With regard to Defendants' March 2017 proposed IEP claims, Defendants argue that those claims are not moot because: (1) L.D.'s invoking of the "stay put" provision of the IDEA which allowed him to remain at his current school did not prevent him from being harmed by the March 2017 proposed IEP; rather, the school's insistence on removing him from his then-current placement prevented them from implementing an appropriate program at that placement; (2) Defendants do not need to show that L.D. suffered substantive harm in order to obtain relief as the ALJ found that A.K. and C.K. were denied meaningful participation in the development of the March 2017 IEP because the placement at R.T. Fisher was "predetermined" by SCBOE; and (3) these claims are not moot because Defendants are seeking compensatory education and still have a cognizable interest in the outcome of the litigation regarding the March 2017 IEP. *Id.*

As to Plaintiff's' contention that Defendants did not exhaust their administrative remedies regarding claims of predetermination of L.D.'s placement and the appropriateness of the facilities at R.T. Fisher, Defendants respond that their Due Process Complaints put Plaintiff on notice of the issues because they disputed the appropriateness of the R.T. Fisher placement in several places and included enough facts thereon to satisfy fair notice requirements. *Id.*

With respect to Plaintiff's contention that it is entitled to a judgment on the pleadings regarding Defendants' claims regarding physical restraint and isolation because they did not include these claims in their Due Process Complaints, Defendants respond that their allegations that L.D. was isolated in a corner of the classroom and had little to no interaction with the class, along with their allegation that the autism team recommended and implemented social separation

3

before discussion with A.K. and C.K., were sufficient to provide SCBOE with fair notice of their claims of isolation and restraint. *Id.*

Addressing Plaintiff's contention that it is entitled to a judgment on the pleadings on Defendants' Section 504 and ADA claims because they are barred by the statute of limitations, Defendants respond that Tennessee's minority-tolling law applies to these claims because the law freezes the statute of limitations "for so long as the person to whom the claim belongs is under a disability because of age or unsound mind" and L.D. is still a minor. *Id., citing Sullivan ex rel. Beneficiaries v. Chattanooga Med. Inv'rs, LP*, 221 S.W.3d 506, 510 (Tenn. 2007). Defendants also respond that they are were not required to exhaust their non-FAPE related Section 504 and ADA claims because claims regarding access to programs and activities that non-disabled students enjoy do not require exhaustion. *Id., citing Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 756 (2017). Defendants further note that they did exhaust the FAPE related Section 504 and ADA claims because they plead facts that put Plaintiff on notice of their theories. *Id.*

Regarding Plaintiff's contention that it is entitled to a judgment on the pleadings on Defendants' claims regarding systemic violations of IDEA, Section 504, and the ADA for lack of standing and lack of subject matter jurisdiction, Defendants' respond that under this Court's recent precedent in *LL v. Tenn. Dep't of Educ*, No. 3:18-cv-00754, 2019 U.S. Dist. LEXIS 25194 (M.D. Tenn. Feb. 15, 2019), allegations that SCBOE's policy of placing students with disabilities at R.T. Fisher, a setting that does not provide those students equal access to comparable programs and activities that are available to non-disabled students, represents a district-wide policy that falls under the type of systemic violation of IDEA that does not require individualized fact-finding and would not require exhaustion. *Id.* Defendants additionally respond that they

4

have standing because they have been injured by SCBOE's policy of placing students with disabilities at a facility that is not comparable to the facilities that serve non-disabled children because the district's insistence on moving L.D. to R.T. Fisher prevented school staff from providing him with a FAPE at his "stay put" placement. *Id.* Defendants note that, although L.D. is no longer enrolled in the district, he is still a resident of Sumner County and continues to be harmed by the SCBOE's discriminatory policies and procedures. *Id.*

Plaintiff, in its Reply, argues that Defendants have failed to exhaust their administrative remedies on their claims of systemic violation, predetermination, appropriate facilities, restraint and isolation, Section 504, and the ADA because: (1) "Counter-Plaintiffs have not shown that their administrative pleadings met the Tennessee's pleading requirement to provide SCBOE fair notice (i.e., reasonable certainty) of the issues in the case, the laws allegedly violated, and the nature of wrongs and injuries." Docket No. 49. Specifically, Plaintiff argues that Defendants failed to exhaust their claims of systemic violation because the case they cited distinguishes between allegations of a categorical refusal to offer mainstreaming opportunities to preschoolers and allegations of a practice of placing special education students who need certain supports at a certain school, with the court finding that the former would be futile to exhaust but the later is an allegation of the mishandling of individual cases which was better addressed by experts on the ground and therefore required exhaustion. *Id.* Plaintiff contends that Defendants' plead no facts to indicate that all students with disabilities are categorically placed at R.T. Fisher and their allegations would be almost impossible to consider without a developed factual record for each child, therefore requiring exhaustion. *Id.*

As to Defendants' claims of predetermination, Plaintiff replies that Defendants'

administrative pleadings did not use the language "predetermination" or cite to law asserting

such claim, and further reply that the facts alleged do not support a claim of predetermination,

such that they have failed to exhaust their administrative remedies as to predetermination.  *Id.*

With respect to Defendants' claims regarding appropriate facilities, Plaintiff argues that

Defendants failed to exhaust these claims because they did not directly plead any facts or law

about SCBOE facilities, when defined as a building or physical structure of some sort, such that

they did not put Plaintiff on notice of these claims.  *Id.*

Turning to Defendants' claims regarding restraint and isolation, Plaintiff argues that

Defendants failed to exhaust these claims because their pleadings fail to put Plaintiff on notice of

what law(s) it allegedly violated with regard to the averred use of restraint and isolation.  *Id.*

Plaintiff maintains that because the IDEA does not directly regulate the use of restraints or

isolation with students with disabilities, the only possible cause of action under the current

pleadings would fall under the Tennessee Special Educational Behavioral Supports Act

("SEBSA"), Tenn. Code Ann., § 49-10-1301 *et seq.*  Plaintiff argues that the facts alleged in

Defendants' pleadings do not constitute isolation, seclusion, physical holding restraint, or

mechanical restraint as defined under the SEBSA.  *Id.*  Accordingly, Plaintiff argues that it was

not given fair notice of these claims such that Defendants have failed to exhaust their

administrative remedies on these claims.

Addressing Defendants' Section 504 and ADA claims, Plaintiff replies that because the

gravamen of their claim is directly related to a FAPE, they are required to exhaust their

administrative remedies on these claims.  *Id.*  Plaintiff further replies that because neither due

process complaint claimed a violation of Section 504 or the ADA, Defendants were required to at

least plead sufficient facts to put SCBOE on notice of the claims.  *Id.*  Plaintiff argues that Defendants failed to do so such that they have failed to exhaust their administrative remedies as to these claims.  *Id.*

Plaintiff additionally argues that it is entitled to a partial judgment on the pleadings because Defendants lack standing since they point to no direct injury that has been sustained by L.D. as it relates to the placement of other students at R.T. Fisher.  *Id.*  Plaintiff also replies that Defendants have failed to explain how the fact that they are residents of Sumner County relates to a claim regarding other unknown students allegedly being served in a program that has never been offered for L.D. or explain how any such relationship causes L.D. harm such that they have failed to show that L.D. was injured in fact and therefore lack standing.  *Id.*

With regard to Defendants' assertion that their claims about the March 2017 proposed IEP are not moot, Plaintiff responds that their claims do not relate to the March 2017 IEP, but instead relate to the appropriateness of the IEP in place prior to the IEP proposed in March 2017. *Id.*  Plaintiff argues that it has not moved for judgment on any claims related to the provision of services already in place as of March 2017 under a prior IEP such that Defendants' assertion on this point has no merit.  *Id.*

Turning to Defendants' claim that they were harmed by Plaintiff's alleged predetermination because they were denied "meaningful participation," Plaintiff argues that Defendants failed to plead predetermination and failed to plead any facts in either due process complaint to support that the alleged predetermination denied them "meaningful participation." *Id.*  Plaintiff further argues that simply rejecting a parent's proposal does not deny that parent of meaningful participation such that the mootness doctrine bars these claims.  *Id.*

Finally, Plaintiff argues in its Reply that it is entitled to partial judgment on the pleadings because Defendants' Section 504 and ADA claims are barred by the statute of limitations. *Id.* Plaintiff argues that Tennessee's minority tolling statute should not apply because it would be inconsistent with federal policy. *Id.* Plaintiff maintains that the Sixth Circuit did not consider how minority tolling may undermine the federal policy regarding redressing educational harms under Section 504 or the ADA, but rather, analyzed the federal policy underlying the Rehabilitation Act claims by analogy to civil rights violations under 42 U.S.C. § 1983. *Id.* Plaintiff contends that this Court should therefore distinguish the cases and find that Defendants' claims are not subject to minority tolling. *Id.*

For the reasons discussed below, the undersigned finds that Defendants' claims regarding the March 2017 IEP are moot, but that the remainder of Defendants' claims should be permitted to proceed at this juncture of the proceedings. The undersigned therefore recommends that Plaintiff's Motion for Partial Judgment on the Pleadings (Docket No. 42) be GRANTED IN PART and DENIED IN PART. Specifically, the undersigned recommends that Plaintiff's Motion be granted with respect to Defendants' March 2017 IEP claims, but denied in all other regards. Because this case involves a minor, the undersigned further recommends that this Report and Recommendation be filed under Seal.

**II. Allegations of Defendants' Counterclaim,
March 2017 Due Process Complaint, and June 2017 Due Process Complaint**

**A. Allegations of Defendants' Counterclaim**

The allegations of Defendants' Counterclaim relevant to the grounds of the instant Motion are as follows:

12.     L.D. is a nine year-old child with disabilities who, for all times relevant, was enrolled as a special education student in the Sumner County school district.

13.     L.D. attended his zoned school, Watt Hardison Elementary (WHE) for Kindergarten through the second grade. While attending WHE, L.D. regressed in his ability to communicate and experienced an increase in maladaptive behaviors commonly associated with autism spectrum disorder (ASD).  The teachers and staff at WHE were not appropriately trained in de-escalation techniques or in how to effectively handle disability-related behaviors.  Positive behavior strategies - scientifically proven to be effective with children with autism and associated developmental and communication delays - were not utilized in any meaningful way.

14.     L.D.'s maladaptive behaviors dramatically increased under the Board's programming.

15.     Rather than employ evidence-based strategies designed to teach L.D. appropriate behaviors, the Board resorted to physical restraint and restricted L.D.'s movement within the school.  L.D. was placed in a restricted environment without freedom of movement, away from typically-developing peers.

16.     Cheryl Cooper, an autism consultant with the school district, was assigned to assist L.D.'s teacher in implementing interventions to address his behavioral issues.

17.     In November 2016, Ms. Cooper implemented a separate work area in the classroom for L.D.

18.     L.D. was required to stay in his segregated work area for the majority of the school day.  He was forced to sit for at least 90 minutes at a time and work on independent activities under the supervision of a classroom aide.  He was allowed breaks if he completed his work, but was forced to sit even during his breaks.  Multiple classroom aides were rotated through his area and the actual aide attending to him changed up to 11 times a day.

19.     The school claimed it recorded over 700 incidents of
        aggression from L.D. during the 2016-2017 school year.
        This included aggression towards staff and other students,
        as well as self-injurious behavior.  Dr. Laura Forkum, a
        Board Certified Behavioral Analyst (BCBA) retained as an
        expert by the school district, admitted at the due process
        hearing that in her opinion a competent BCBA working
        with L.D. could have reduced the 700 incidents.

20.     School staff documented some of L.D.'s self-injurious
        behavior, but a functional behavioral assessment (FBA)
        was never performed to identify the cause of the behavior
        or to assist in the development of a research-based behavior
        intervention plan to address it. The documented behaviors
        included: biting the desk, biting himself, biting puzzle
        pieces, biting the furnace, chewing on an electrical cord that
        was plugged into a wall socket, hitting his head on the
        floor, placing puzzle pieces between his gums until they
        bled, kicking the wall, biting a metal leg of a desk, and
        hitting his head on the desk.

21.     L.D. was not allowed to participate in music or art, which
        was available to other students, for most of his first and
        second grade years.  Although he ate lunch in the cafeteria,
        he was not permitted to eat with his peers, typically-
        developing or otherwise. He was required to eat at a
        separate table near an aide.

22.     In March of 2017, A.K. and C.K. attended a Special
        Olympics event at WHE.  While there, they observed L.D.
        in his classroom and saw that he was seated by himself
        behind a U-shaped desk that is normally used by classroom
        teachers.  The desk was pushed up against the wall so that
        L.D. was unable to leave the area.  He did not have access
        to his communication device (iPad), which he was learning
        to use to communicate, and his view of his classmates was
        obstructed by bookshelves.  An aide was standing nearby
        but she was not seated at the table with him.

23.     In March of 2017, the Board discussed options with the
        parents and recommended a change of placement to R.T.
        Fisher.  R.T. Fisher is an alternative school for students
        involved in disciplinary infractions, and is a more

restrictive placement. There are no general education students educated at R.T. Fisher other than those placed in the alternative school for disciplinary infractions.

24. There was no discussion about completing an updated functional behavioral assessment (FBA), revising L.D.'s behavior intervention plan, or providing additional training and supports at L.D.'s home school, before the Board proposed this much more restrictive setting.

25. At the parents' request, an IEP Meeting was convened on March 28, 2017. At that meeting, the parents proposed several options for providing L.D. with additional supportive services that could alleviate the need to change L.D.'s placement to a more restrictive setting. The first option was for L.D.'s private board certified behavior analyst (BCBA) to work with L.D. in the classroom for up to 20 hours per week at no cost to the Board. The second option was for L.D. to attend school half-days and receive private behavioral analytic services at home. A third option presented by the parents was for the Board to provide a dedicated aide to assist L.D. during the school day.

26. The Board rejected all three options without the IEP Team giving the options appropriate consideration. The administrative law judge (ALJ) presiding over the hearing ultimately concluded that the placement decision was pre-determined, and was a unilateral decision by the Board to transfer L.D. to the alternative school.

27. The parents thereafter filed a complaint requesting a due process hearing, and invoked the IDEA stay-put protections so that L.D. could continue at his home school.

28. School districts are required to exhaust measures prior to moving a qualifying child along the continuum of alternative placements. The 2006 federal regulations state that a school district should make a diligent effort to educate a student in a less restrictive environment before proposing a more restrictive one. Whenever there is a reasonable likelihood that a student with a disability can be educated appropriately in a regular education classroom, with the use of supplemental aids and supports, then a

regular classroom placement should be the placement until those efforts have been exhausted. 34 C.F.R. 300.114(a)(2).

29. The alternative placement that the Board proposed was not designed for children with disabilities, and the IEP did not provide for the provision of behavioral services. The IEP was also updated to allow for physical restraints to be used on L.D. at the new placement.

30. Tennessee Rules and Regulations 0520-01-09.05 require that facilities that serve children with disabilities be comparable to facilities that serve non-disabled students.

31. R.T. Fisher does not have a playground or any related arts. The students are required to wear uniforms and eat lunch in their classrooms. The classroom to which L.D. was assigned served students in grades K-12.

32. In May of 2017, attorneys retained by A.K. and C.K. sent a written request to the Board's attorneys asking for an FBA and a sensory integration evaluation to be funded as Independent Educational Evaluations (IEE), and allowable request under the IDEA. 34 CFR 300.502(b)(1).

33. In June of 2017, the school district sent a letter in response to the IEE request stating that they declined to fund either IEE. The Board did not file a due process complaint to defend its in-house evaluations as required under the IDEA.

34. On June 12, 2017, another IEP meeting was held. The school district informed the Petitioners that the program at R.T. Fisher had been moved to Guild Elementary. They presented an updated IEP listing Guild as the serving school.

35. However, not all of the special education programs at R.T. Fisher were relocated; yet, the school district continues to place special education students with IEPs at R.T. Fisher despite the lack of appropriate services.

36. The program at Guild required that L.D. "earn" his way back to his zoned school. The goals that L.D. would need

to meet in order to "earn-out" were not discussed and were not part of the proposed IEP.

37.     The IEP stated that L.D. would only be included in related arts and other inclusion activities if his behavior allowed it.

38.     The IEP did not include any behavior related services.

39.     The IEP was also updated to allow physical restraints to be used with L.D.

40.     Because the program at Guild was not reasonably calculated to provide educational benefit to L.D., A.K and C.K. declined to accept the placement and filed a second due process complaint.

41.     The parents thereafter enrolled L.D. in Illuminate Academy (IA), a homeschool based program designed to serve children with disabilities.

. . .

***The Due Process Hearing***

. . .

56.     In his Final Order, the administrative law judge determined that: (1) the Board had failed to educate L.D. in his least restrictive environment; (2) L.D. was not provided a FAPE during the 2016-2017 school year; (3) the Board had "predetermined" L.D.'s placement to R.T. Fisher Alternative School, thwarting his parents' meaningful participation in the march 2017 IEP meeting; (4) R.T. Fisher was not "comparable" to that utilized by the Board for educating non-disabled children; (5) Guild Elementary School, a subsequent placement option presented to the parents as an alternative to R.T. Fisher, would not have appropriately addressed L.D.'s behavior needs or provide L.D. with a FAPE; and (5) the Board's "unwillingness to provide appropriate behavioral interventions caused L.D.'s behaviors to escalate to the point that he was unable to benefit from the educational services the LEA offered." []

***The School District Improperly Predetermined L.D.'s Placement***

57.   The Board improperly "predetermined" that L.D. would
      transfer to R.T. Fisher Alternative School, and the decision
      to change L.D.'s placement was already made by Board
      staff prior to the March 2017 IEP Meeting.

58.   Predetermination takes place when a school district makes
      educational decisions too early in the planning process, in a
      way that denies the parents a meaningful opportunity to
      fully participate as equal members of the IEP team. [] It
      occurs most visibly when school officials present just one
      educational option at an IEP meeting combined with an
      unwillingness to consider alternatives. . . . Predetermining a
      child's placement denies a parent meaningful participation
      in the student's IEP development and may constitute a
      denial of FAPE. []

59.   The predetermination inquiry is inherently fact-intensive. []
      Significant deference is given to the factual findings of an
      administrative law court and "administrative fact findings
      are considered to be prima facie correct, and if a reviewing
      court fails to adhere to them, it is obliged to explain why."
      []

60.   In this case and based upon the evidence presented, it was
      unmistakable to the administrative law judge that the
      Sumner County Board of Education had improperly
      predetermined L.D.'s placement during the 2016-2017
      school year.

***The Board Violated L.D.'s Right to a FAPE and to be***
***Educated in his Least Restrictive Environment***

                              . . .

65.   Appropriate and evidence-based supplementary aids and
      services were not considered or presented by the Board
      before making the drastic jump to a more restrictive setting.
      For example, the Board rejected outright the parents'
      request that L.D. be provided an aide at his home school.

66.   Significantly, the administrative law judge determined that

the Board had not provided L.D. with behavioral analysis services that could have allowed him to be educated at his home school. The court concluded, "Instead of treating L.D.'s maladaptive behaviors so it could provide L.D. a FAPE, the LEA chose to simply restrict his physical movement within the school."

67.     The Board's failures and inaction denied L.D. a free and appropriate public education.

. . .

**A.      Defendant/Counter-Plaintiffs claims under the IDEA - Appeal**

. . .

82.     Under the IDEA, Plaintiff/counter-defendant was responsible for providing L.D. with a free, appropriate public education, as described herein. The Sumner County Board of Education failed to comply with the IDEA, thus requiring Defendant/counter-plaintiffs to utilize IDEA's due process procedures. As a result of the Board's actions, L.D. has suffered extreme harm including, but not limited to, loss of educational opportunities and programs and denial of due process. L.D. has been denied meaningful and equitable educational opportunities and programs, as guaranteed by federal and state law.

. . .

**B.      Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 19173 [*sic*].**

. . .

89.     Plaintiff/Counter-defendant has intentionally, and with willful and malicious disregard of Defendant/Counter-plaintiffs' federally protected rights, discriminated against Defendant/Counter-plaintiffs based on L.D.'s disabilities and/or C.K. and A.K.'s association with a person with a disability. Plaintiff/Counter-defendant has acted in bad faith and exercised gross misjudgment.

90.     Specifically, and without limitation, Plaintiff/Counter-defendant has refused to ensure that L.D. was able to participate in and access the benefits of its services and educational program in the same manner as his non-disabled peers.

91.     The Board failed to provide access and reasonably accommodate Defendant/Counter-plaintiffs, including L.D., and it failed to make reasonable modifications in the policies, practices, or procedures when the modifications were necessary to avoid discrimination.  The Board was required, but failed to consider L.D.'s unique needs for services, as well as all alternatives, prior to excluding him from its general educational programming.  Neither accommodating L.D. nor modifying the Board's applications of its policies, practices, or procedures so as to allow L.D.'s participation in the Board's educational program would have caused undue burden or constituted a fundamental change in the operations of the Board's programs.  28 C.F.R. 35.130(b)(7) and (8); 34 C.F.R. 104.35.

92.     The Board, by its actions and inactions described herein, has, intentionally, and with the willful and reckless disregard for the rights of Defendant/Counter-plaintiffs, failed to provide L.D. with a non-discriminatory public educational program which is designed to meet his unique needs.  Contrary to the mandates of § 504, the Board intentionally and with reckless disregard, denied L.D. the benefits of equal opportunities to enjoy and participate in educational programs and services as compared with students who are not disabled.  20 U.S.C. § 794.

**C.     Systemic violations of IDEA, Section 504 and ADA**

93.     Sumner County Schools continues to place students with disabilities at R.T. Fisher, a setting that does not provide those students equal access to comparable programs and activities that are available to non-disabled students.

. . .

Docket No. 19 (footnote omitted, emphasis original, citations omitted).

Remedy requests included in Defendants' Counterclaim relevant to the instant Motion

include:

> 5.    Issue a declaratory judgment that the Board's substantive educational practices, policies, procedures and conditions are violative of defendant/counter-plaintiffs' rights as secured by the IDEA.

> 6.    Issue a declaratory judgment that Plaintiff/Counter-defendants actions and inactions in failing to ensure that the Board's educational program provided full and equal services in compliance with federal nondiscrimination standards are violative of Defendant/counter-plaintiffs rights as secured by the Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. and the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794.

> 7.    Enter an Order that the programs for disabled children at R.T. Fisher be moved to a location that will allow those students equal access to programs and activities available to non-disabled students.

*Id.*

## B.  Allegations of Defendants' March 2017 Due Process Complaint

The allegations of Defendants' March 2017 Due Process Complaint are as follows:

> On March 16, 2017, the Sumner County School Board employee members of the IEP team made the decision to transfer [L.D.] to the only alternative school available in the county, called RT Fisher. Also in attendance at that meeting, who disagreed with that change in placement, were his parents, his advocate, and his private therapy BCBA.
> 
>                              . . .
> 
> . . . Our disagreements are as follows:

> ### Regarding Change of Placement from WHE to RT Fisher Alternative School (RTF)

> All children have the right to be in the least restrictive environment

as per federal law.  RTF doesn't provide [L.D.] with that right.

- Restraints - The use of restraints represents the furthest thing from least restrictive.  We do not approve, nor consent, to the use of restraints on our child.  Historically, restraint usage increased behaviors and we no longer use restraint as a result.  It is our opinion, based upon [L.D.'s] history and observation, that the use of restraints will exacerbate his symptoms and [is] likely to result in new and more dangerous behaviors.

- Medical - [L.D.] has food allergies.  Upon our tour of RTF, the teacher there, Mrs. Highsmith, indicated there were kids in the class who eat peanut butter every single day for lunch.  As [L.D.] has a peanut allergy, this becomes a safety concern.  He has a right to be in a safe environment.

- [L.D.] struggles with transitions.  This has been documented many, many times on a variety of IEP, FBA, and other documents in his educational record.  A change so large as an entire school, classroom, staff, and routine will only increase his behaviors.

- Total lack of inclusion - RTF offers no opportunity for inclusion with typically developing peers.

- Speech-Language Services (SLP) - SLP services would be cut from four (4) visits per week to only two (2).  Yes, the time per week stayed the same, but it has been documented that [L.D.] struggles with focus for longer periods of time.  It was upon the recommendation of SLP Rebecca Vergho that his SLP sessions be more frequent but with a shorter time duration.

- The change in placement was recommended based upon the school team members' determination that this was a move for his safety.  Data provided by the school indicated that [L.D.'s] behaviors have actually decreased since the beginning of the school year.  In February, 2017, we received a positive report at a parent teacher meeting.  The school indicates that between that February meeting and the March 16 IEP date, that his behaviors increased in intensity.

The interventions identified in the IEP meeting were the same interventions tried and used by the team during his entire school year.  A change in placement should not be considered as an intervention until every possible intervention is attempted.  The school board was unmoved by any of our suggestions.

- The data provided at the IEP meeting and used to determine a change in placement was incomplete.

### Regarding FAPE

Sumner County Schools is not currently providing [L.D.] with the appropriate education that is his right under FAPE.  He has not gained meaningful educational benefit overall during the past two school years.

With regards to the lack of meaningful progress:

- At the start of the 2015/2016 school year, [L.D.] showed marked regression in language and behavior at home and at school.  We requested a series of evaluations during an IEP meeting we called on 9/10/15.  We requested updated testing, as he'd not been tested since he started with SCS.

- Carmen Dorris noted in her OT evaluation that [L.D.] "understood the token board and working for a preferred object, but the system was not used consistently."

- In the AAC evaluation, Kristin Lazenby noted that [L.D.'s] communication book in the classroom was empty inside.  With it being empty, it could hardly be used appropriately.

- Progress report 1 for the 2015/2016 school year - Objectives showed missing data, so no confirmation that data was actually collected.  Many goals not notated with progress by new teacher.  New teacher in a few cases left previous teacher's data/wording in place.  Documented regression.

- In the 11/16/16 annual IEP meeting, we discussed his

most recent progress report and how [L.D.] had met only TWO (2) of his THIRTY-FOUR (34) annual objectives. Not a single goal was met. Documented regression.

- Still unmet goals have been carried over since the 2014/2015 IEP (3 IEP changes since then). One goal from 2014/2015 was removed in 2016 and re-added in 2017.

- He no longer is receiving the inclusion time spelled out in his IEP. In the 3/16/17 meeting, Ms. Chandler stated that he's been unable to attend any specials or inclusion time. He'd already been restricted down to only gym for specials. The lack of time for that physical activity is likely a factor in his behavior.

- [L.D.] is currently isolated in a corner of the classroom. He has little to no interaction with the class. Social separation was a recommendation of the autism team and put into play before discussion with parents.

With regards to behavior:

A functional behavior assessment (FBA) was completed upon our request at the 9/10/15 meeting. Areas of struggle included: doing non-preferred activities, being left alone, transitions, and unexpected changes to routine. The behavior intervention plan (BIP) put into place for [L.D.] at that time included three goals to target transitions, non-preferred activities, and communication.

- Few changes have been made to his actual BIP goals. Changes made in regards to behavior have hardly been communicated to home. Some changes violated his IEP goals (removal of the visual schedule which made goals regarding usage impossible).

- Noted in 9/21/16 BIP meeting, behaviors are still present but reduced. Also noted "Implementation of BIP strategies have been found to decrease the frequency of this aggression."

- Behaviors have shown an overall downward trend based on the provided data from his teacher. Intensity of behaviors has been reported to have increased, but the

provided data cannot prove this (at least not the data provided to parents).

- At the parent-teacher conference on 2/21/17, Miss Chandler reported that his overall behavior had improved. Yet hardly three weeks later, a change in placement was proposed due to behaviors.

### Proposed Resolution

We have proposed several options for keeping [L.D.] in his current placement that would have made due process unnecessary, including: parent-provided ABA therapy in classroom for up to 20 hours per week, a split-day program where [L.D.] attended WHE in the morning and did 20 hours a week of ABA therapy in the home after school, a 1:1 Registered Behavior Technician (a paraprofessional who practices under the close, ongoing supervision of a BCBA or BcaBA), and additional training for the classroom teacher. All these options were rejected with no more explanation than "county policy" or "No, because we have an option we feel best suits his needs". The dismissal of our previous proposals brings us to this complaint and request for a due process hearing.

*See* Sealed Administrative Record, filed manually on CD, pp. 1-6 (emphasis original).

## C. Allegations of Defendants' June 17 Due Process Complaint

In their June 2017 Due Process Complaint, Defendants alleged the following:

### STATEMENT OF FACTS

6.      In 2014, L.D. began kindergarten at Watt Hardison Elementary School. He was evaluated and was found eligible for special education services.

7.      In September of 2015, A.K. and C.K, requested that the school complete a psychoeducational evaluation for L.D. because of concerns they had with his language and behavior. They also requested evaluations for occupational therapy and assistive technology as well as a Functional Behavior Assessment ("FBA").

8.     On September 22, 2015, Kristin Lazenby, a speech language pathologist with SCS, completed the assistive technology assessment. It does not appear that she produced an actual report, but her observations and recommendations were included in an email dated September 24, 2015. In her email, she recommends that the communication book L.D. used actually be populated with pictures so that he could learn to navigate to the picture he needed.[1]

9.     Brittany Marshall, a school psychologist with the district, completed the psychoeducational evaluation, the FBA and a Behavior Intervention Plan ("BIP") in October 2015.

10.     Carmen Dorris, an occupational therapist with the district, completed the Occupational Therapy evaluation in November 2015. Ms. Dorris did not complete any formal assessments but relied on parent and teacher interviews, a record review and observations in the classroom to determine that L.D. did not require an occupational therapy intervention at that time.

11.     On October 22, 2015, the IEP team met to review the completed evaluations. The team also agreed to implement the BIP.

12.     On November 15, 2015, the IEP team met again to review the BIP and to develop L.D.'s annual IEP. Notes from the meeting indicate that L.D.'s teacher, Cary Hall, stated that L.D. 'was improving in his time to be redirected during transitions.' It does not appear that any changes were made to the BIP.

13.     On September 19, 2016, the IEP team met to review the BIP. The notes from the IEP meeting indicate that 'aggressive behaviors were still present but the amount has reduced.' The notes also indicate that L.D. was working in a separate area and that the staff was working towards moving him in with other groups.

---

[1] She noticed in her observations that the book's pages were blank and that all of the pictures were actually on the front of the book.

14. In November 2016, A.K. and C.K. provided L.D. with an iPad on which they had installed the Proloquo2Go communication system. The school district allowed L.D. to use the device at school and A.K. provided school staff with some basic training on how to use the device. L.D. referred to the device as his 'talker'. However, the device was not consistently used by school personnel.

15. On March 16, 2017, the school district scheduled an IEP meeting to discuss changing L.D.'s placement to R.T. Fisher.

16. A.K. and C.K. disagreed with the proposed change of placement and filed a due process complaint. That complaint is currently pending with Administrative Law Judge Michael Begley.

17. Beginning the first week of April, the school district began assigning various school district personnel to sit with L.D. in his isolated work area. The school district stated that this was necessary to ensure safety. It is unclear on the amount of training provided to the school personnel.

18. On May 15, 2017, A.K. and C.K. requested Independent Educational Evaluations ("IEE") for an FBA as well as a sensory integration evaluation. The school district has not approved the requests nor have they filed a due process complaint in reference to the IEE requests.

19. On June 1, 2017, A.K. and C.K. sent notice to SCS through their attorney that they were planning on placing L.D. at Illuminate Academy and would be seeking reimbursement from the school district.

20. On June 12, 2017, another IEP meeting was held to discuss placement. The school district proposed placing L.D. at Guild Elementary in the Therapeutic Behavior CDC program. The district explained that the program that had been housed at R.T. Fisher would be moving to Guild Elementary.

21. The school district also added language to L.D.'s IEP which would allow school district personnel to restrain him.

22.     None of L.D.'s previous IEPs or the proposed IEP include any behavior support services.

23.     A.K. and C.K. disagree with the proposed change in placement.  They also disagree with including language in the IEP that allows the school district to restrain L.D.

**Violations**

1.     SCS violated 34 CFR 300.502 by failing to either approve the IEE requests or file a due process complaint to show that its evaluation is appropriate.

2.     SCS failed to thoroughly evaluate L.D. in order to obtain reliable baselines and present levels of functioning for which to design appropriate goals and service designations for his specialized instruction.

3.     SCS failed to provide appropriate behavioral supports to L.D. which would allow him to remain in his current placement.

4.     SCS failed to adequately train school personnel working with L.D. on the use of his communication device.

5.     SCS failed to ensure that L.D. had consistent access to his communication device.

6.     SCS prohibited L.D. from attending related arts classes due to his behavior.

7.     SCS failed to provide for appropriate or sufficient related services, behavioral supports, speech/language therapy and/or specialized instruction time.

8.     SCS's conduct falls short of its obligations to L.D. in the least restrictive environment (LRE).  SCS is legally required to provide L.D.'s education in a regular classroom environment to the maximum extent appropriate, or to the extent not appropriate, with the least possible segregation from LD's non-disabled peers and community.  L.D. can be "educated satisfactorily" in his local school setting with supplementary aids and services. However, SCS has not

made reasonable efforts to accommodate L.D. in the local school setting. Moreover, the educational benefit to L.D. in his home school setting with supports exceeds the educational benefit to be provided by SCS's proposed change of placement. And, SCS cannot prove how L.D.'s disability has a negative impact on other students such that it outweighs his right to be educated in his home school. SCS's erroneous placement is the fault of its failing L.D. by not properly evaluating L.D. This in itself undermines and de-legitimizes SCS's proposed change of placement determination.

## Remedies

Petitioners ask that the Administrative Law Judge ("ALJ") require the Respondent to:

a. Provide compensatory education for its failure to provide L.D. with a free appropriate public education for the 2015-2016 and 2016-2017 school years;

b. Provide funding for L.D. to attend Illuminate Academy;

c. Compel the school district to fund IEEs for an FBA and a sensory integration evaluation;

d. Order SCS to conduct all necessary evaluations and re-evaluations;

e. Enjoin SCS from its change of placement; and, order that the "Stay Put" provisions of the IDEA and its regulations apply in this case;

f. Order SCS to appropriately train applicable staff working with L.D., including administrators, in the behavior program to competency and in consistent implementation of his BIP;

g. Provide Petitioners' attorney a complete copy of any and all documents including, but not limited to: any waiver(s) of rights that have been executed by

Petitioners, forms, notes, letters, emails, references, evaluations, attendance records, grade reports, discipline reports, requests for access to the records of L.D.., and/or other records or media whatsoever the nature relating to L.D. that is/are currently being held or stored by any teacher, principal, superintendent or other administrator . . .

    h.  Provide any other relief that the ALJ deems appropriate;

    i.  Award the Petitioners their attorney fees.

*See* Sealed Administrative Record, filed manually on CD, pp. 87-94 (emphasis and footnote original).[2]

### III.  Law and Analysis

**A.  Judgment on the Pleadings**

Fed. R. Civ. P. 12(c) states:

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings.  If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56...

Judgment on the pleadings should be granted if the movant is entitled to judgment as a matter of law.  *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (internal citations omitted).  When evaluating a Motion for Judgment on the Pleadings, the Court may consider all of the pleadings and any attachments to them.  *See* Fed. R. Civ. P. 10(c).  The Court is required to construe the facts in the light most favorable to the nonmoving party, and must accept the

---

[2] Although each of Defendants' due process complaints was originally assigned to a different ALJ, the actions were consolidated.  *See* ALJ Begley's Order entered August 8, 2017, *id.*, pp. 184-86.  Upon consolidation, the allegations contained within each due process complaints remain apposite.

nonmovant's allegations as true. *Wallin v. Norman*, 317 F.3d 558, 561 (6th Cir. 2003), *citing Lavado*, 992 F.2d at 605 (internal citations omitted). Despite the Court's responsibility to liberally construe the facts in favor of the nonmoving party, "more than bare assertions of legal conclusions is ordinarily required to satisfy federal notice pleading requirements." *See Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). Accordingly, the Court does not have to accept as true mere legal conclusions and unwarranted inferences of fact. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

As Fed. R. Civ. P. 12(c) states, however, if the Court considers materials outside of the pleadings and their attachments, the Motion for Judgment on the Pleadings is to be treated as a Motion for Summary Judgment, subject to the applicable standards.

**B. Individuals with Disabilities Education Act - 20 U.S.C. § 1400, *et seq*.**

The IDEA is a federal statute enacted to ensure that all children with disabilities have access to a free appropriate public education ("FAPE") designed to meet their unique needs. *Burilovich ex rel. Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.*, 208 F.3d 560, 565 (6th Cir. 2001), *citing* 20 U.S.C. §§1400(d)(1)(A), 1401(25), 1412. The IDEA additionally establishes formal administrative procedures for resolving disputes between parents and schools concerning the provision of a FAPE. *See*, *e.g.*, 20 U.S.C. § 1415(a). One of those procedures is the opportunity to present complaints "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). Any complaints must be given an impartial due process hearing, and, if necessary, a review by a higher state agency. 20 U.S.C. §§ 1415(f), (g). Persons dissatisfied with the results of the administrative hearing and appeal may,

after exhausting their administrative remedies, file suit in state or federal court for judicial review

of the administrative decision.  20 U.S.C. §§ 1415(I), (l).  Absent a few exceptions, plaintiffs

must exhaust their administrative remedies before filing a civil action to enforce their rights

under the IDEA.  *Id.*  The party bringing the action has 90 days from the date of the decision of

the hearing officer to file suit.  20 U.S.C. § 1415(i)(2)(B).

With regard to the IDEA's exhaustion requirement, the provision requiring exhaustion

covers not only claims brought under the IDEA, but claims that could have been brought under

the IDEA:

> Nothing in this chapter shall be construed to restrict or limit the
> rights, procedures, and remedies available under the Constitution,
> the Americans with Disabilities Act of 1990, title V of the
> Rehabilitation Act of 1973, or other Federal laws protecting the
> rights of children with disabilities, except that before the filing of a
> civil action under such laws seeking relief that is also available
> under this subchapter, the procedures under subsections (f) and (g)
> of this section shall be exhausted to the same extent as would be
> required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).

Additionally, when a plaintiff alleges injuries that "could be redressed to any degree by

the IDEA's procedures and remedies, exhaustion of those remedies is required."  *S.E. v. Grant

Cnty. Bd. of Educ.*, 544 F.3d 633, 642 (6th Cir. 2008).

Determining whether the exhaustion requirement is triggered centers on whether the suit

seeks relief for the denial of a FAPE.  *Fry v. Napoleon Community Schools, et al.*, 137 S. Ct. 743

(2017).  As the Supreme Court recently stated:

> [T]o meet that statutory standard, a suit must seek relief for the
> denial of a FAPE, because that is the only "relief" the IDEA makes
> "available." . . . [I]n determining whether a suit indeed "seeks"

relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint.[3]

*Fry, supra* (footnote in original).

The *Fry* Court explained:

> . . . A court deciding whether §1415(l) applies must therefore examine whether a plaintiff's complaint - the principal instrument by which she describes her case - seeks relief for the denial of an appropriate education.

> But that examination should consider substance, not surface. The use (or non-use) of particular labels and terms is not what matters. The inquiry, for example, does not ride on whether a complaint includes (or, alternatively, omits) the precise words(?) "FAPE" or "IEP." After all, §1415(l)'s premise is that the plaintiff is suing under a statute *other than* the IDEA, like the Rehabilitation Act; in such a suit, the plaintiff might see no need to use the IDEA's distinctive language - even if she is in essence contesting the adequacy of a special education program. And still more critically, a "magic words" approach would make §1415(l)'s exhaustion rule too easy to bypass. . . . Section 1415(l) is not merely a pleading hurdle. It requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way.

> . . .

> One clue to whether the gravamen of a complaint against a school concerns the denial of a FAPE, or instead addresses disability-based discrimination, can come from asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school - say, a public theater or library? And second, could an *adult* at the school - say, an employee or visitor - have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege

---

[3] In reaching these conclusions, we leave for another day a further question about the meaning of §1415(l): Is exhaustion required when the plaintiff complains of the denial of a FAPE, but the specific remedy she requests - here, money damages for emotional distress - is not one that an IDEA hearing officer may award? . . .

the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

. . .

A further sign that the gravamen of a suit is the denial of a FAPE can emerge from the history of the proceedings. In particular, a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute - thus starting to exhaust the Act's remedies before switching midstream. . . . A plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE - with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy. . . . But prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term.

*Fry, supra* (italics in original).

In a lawsuit brought to challenge an IDEA administrative decision*, Board of Education v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034 (1982), requires the district court to undertake a "modified de novo review" of the administrative decision. In doing so, the district court must make an independent examination of the evidence and base its decision on a preponderance of the evidence contained in the complete record, while giving "due weight" to the factual findings made in the state administrative proceedings, particularly when educational expertise is essential to those findings. *See M.G. by & through C.G. v. Williamson Cty. Sch.,* 720 F. App'x 280, 283 (6th Cir. 2018), *quoting Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004); *Berger v. Medina City Sch. Dist.,* 348 F.3d 513, 519 (6th Cir. 2003); *N.L. v. Knox County Sch.,*

30

315 F.3d 688 (6th Cir. 2003); *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764 (6th Cir.), *cert.*

*denied,* 533 U.S. 950, 121 S.Ct. 2593 (2001); *Burilovich v. Board of Educ. of Lincoln Consol.*

*Sch.,* 208 F.3d 560, 565 (6th Cir.), *cert. denied,* 531 U.S. 957, 121 S.Ct. 380 (2000). The

"administrative findings in an IDEA case may be set aside only if the evidence before the court is

more likely than not to preclude the administrative decision from being justified based on the

agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both."

*M.G. by & through C.G.,* 720 F. App'x at 283; *Berger*, 348 F.3d at 519; *Burilovich,* 208 F.3d at

567; *see also,* 20 U.S.C. § 1415(i)(2).

## C.  The Case at Bar

As discussed above, judgment on the pleadings is appropriate if, after construing the facts

in the light most favorable to the nonmoving party and accepting the nonmovant's allegations as

true, the movant is entitled to judgment as a matter of law.  *See Wallin*, 317 F.3d at 561; *Lavado*,

992 F.2d at 605.

### 1.  Systemic Violation

Plaintiff argues that Defendants' systemic violation claims fail as a matter of law for lack

of standing, as well as lack of subject matter jurisdiction and/or failure to state a claim upon

which relief can be granted because Defendants' failed to exhaust their administrative remedies

on this claim.  Docket Nos. 42, 43, 49.

Addressing first Plaintiff's contention regarding lack of standing, the Supreme Court has

set forth three elements in order for a party to establish standing: (1) the party must have suffered

an injury in fact; (2) there must be a causal connection between the injury and the challenged

conduct; and (3) it must be likely that a favorable decision will remedy the injury.  *See Whitmore*

*v. Arksansas*, 495 U.S. 149, 154 (1990).

As discussed above, Defendants assert that they have standing because they have been, and continue to be, injured by Plaintiff's policy of placing students with disabilities at a facility that is not comparable to the facilities that serve non-disabled children because Plaintiff's insistence on moving L.D. to R.T. Fisher prevented school staff from providing him with a FAPE at his "stay put" placement, thereby resulting in their need to move L.D. to IA and incur the costs at issue. Docket Nos. 19, 46. Taking Defendants' allegations in the light most favorable to them, and accepting the allegations as true, Defendants have sufficiently alleged an injury that was caused by Plaintiff's challenged conduct. Additionally, if Defendants are granted all relief sought, they will be able to return L.D. to a public placement and therefore the favorable decision will remedy the injury. Accordingly, for purposes of the instant Motion, Defendants have sufficiently established standing and Plaintiff is not entitled to judgment as a matter of law on this ground.

Turning next to Plaintiff's assertion that Defendants' systemic violation claim fails as a matter of law because Defendants failed to exhaust their administrative remedies regarding this claim, Plaintiff notes that a "failure to exhaust IDEA administrative remedies has been analyzed as an issue of subject matter jurisdiction . . . pursuant to Fed. R. Civ. P. 12(b)(1) and/or a failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6)." Docket No. 43. Plaintiff additionally notes that regardless of how they are analyzed, "claims under the IDEA, Section 504, and the ADA are only proper in a civil action when the party has exhausted its administrative remedies." *Id.*

While the law is well-settled that exhaustion is generally required before bringing a cause

of action under the IDEA, the IDEA does not require administrative exhaustion when it would be futile or inadequate to protect a plaintiff's rights. Claims of systemic violations that are best resolved by policymakers are often deemed to be futile or inadequate, such that exhaustion is not required. As this Court recently stated:

> One challenge to discussing allegedly systemic problems, however, is that it is not always clear where the line should be drawn between a *systemic* problem that justifies departing from the usual procedural requirements and a merely *common* problem that does not. The most workable solution, in the view of the court, is to approach the issue practically, with a focus on the purposes of the exhaustion requirement and the question of actual futility or inadequacy of the administrative process. The court should ask whether the plaintiffs, artful pleading aside, have presented a broad, policy-level problem, for which it would be a waste of time to go through the administrative process, or whether they have presented what is, at its core, a context-dependent, student-specific problem that is better addressed by - and stands a meaningful chance of resolution by - the experts on the ground, even if there may be other students suffering from similar alleged deprivations.

*L.L. et al. v. Tenn. Dep't of Educ.*, No. 3:18-cv-00754, Docket No. 28, p. 14 (*Trauger*, February 15, 2019) (emphasis original).

Defendants' contention is that Plaintiff has a district policy of placing students with disabilities at R.T. Fisher, a setting that does not provide students with disabilities with equal access to comparable programs and activities that are available to non-disabled students.[4] Taking this allegation as true and approaching "the issue practically, with a focus on the purposes of the exhaustion requirement and the question of actual futility or inadequacy of the administrative process," a school district policy that denies students with disabilities equal access to comparable

---

[4] In their March 2017 Due Process Complaint, Defendants averred that R.T. Fisher was "the only alternative school available in the county." It appears from the record that Plaintiff has subsequently moved some alternative programs to Guild Elementary.

programs and activities that are available to non-disabled students is a "broad, policy-level problem" that is best resolved by policy makers, such that exhaustion is not required. Accordingly, and because Plaintiff had fair notice of this claim, Plaintiff is not entitled to a judgment as a matter of law regarding Defendants' systemic violation claim.

## 2. March 2017 IEP

Plaintiff argues that Defendants' claims related to the March 2017 IEP fail as a matter of law because they are moot, fail to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and the IDEA, and lack subject matter jurisdiction and/or fail to state a claim for which relief can be granted due to failure to exhaust. Docket Nos. 42, 43, 49.

Addressing first the issue of mootness as it is a threshold matter, taking Defendants' allegations as true, accepting that the March 2017 IEP was not superceded until June 2017 and therefore that Defendants are seeking compensation for that time, and accepting that Defendants continue to have a cognizable interest in the placement of L.D. and in the outcome of the litigation, the undersigned agrees that because the March 2017 IEP was superceded by the June 2017 IEP, because the proposed placement is now at Guild Elementary (not R.T. Fisher), and because placement at R.T. Fisher is no longer possible, Defendants' claims regarding the March 2017 IEP *itself* have indeed become moot.[5] Accordingly, Plaintiff is entitled to a judgment as a

_____

[5] Taking Defendants' allegations in the light most favorable to them, and accepting them as true, the gravamen of the injury alleged and relief sought relates to the denial of a FAPE, which occurred both before and after the March 16, 2017 IEP meeting. The crux of the FAPE denial as it relates to the March 16, 2017 IEP, is actually averred to have happened prior to the March 16, 2017 IEP meeting, as Defendants aver that Plaintiff's decision to move L.D. to R.T. Fisher was a decision that was predetermined and made prior to the IEP meeting. Defendants' claims regarding predetermination, the IEP in place before the March 16, 2017 IEP, and the IEP in place after the March 16, 2017 IEP should continue.

matter of law with regard to Defendants' March 2017 IEP claims.

### 3.  Predetermination and the Appropriateness of Facilities

Plaintiff argues that Defendants' claims regarding the predetermination of L.D.'s placement and the appropriateness of the facilities at R.T. Fisher must also be dismissed because of lack of subject matter jurisdiction and/or failure to state a claim upon which relief can be granted due to failure to exhaust.  Docket Nos. 42, 43, 49.  Specifically, Plaintiff contends that neither of the Due Process Complaints filed by Defendants at the administrative level claimed these violations such that Plaintiff was not given fair notice and Defendants have waived these claims.  *Id.*

Turning first to Plaintiff's predetermination argument, as set forth in the quoted allegations of Defendants' Due Process Complaints above, Defendants' March 2017 Due Process Complaint avers that the Sumner County School Board employee members of the IEP team made the decision to transfer L.D. to R.T. Fisher in contravention of the wishes of his parents, his advocate, and his private therapy BCBA.  Defendants further aver that the change in placement was recommended based on the school team members' determination that it was a move for L.D.'s safety, but the data provided by the school between the start of the school year and February 2017 indicated otherwise and the data provided at the March IEP meeting that was used to justify the change in placement was incomplete.  In Defendants' June 2017 Due Process Complaint, Defendants aver that the school district scheduled an IEP on March 16, 2017 to discuss changing L.D.'s placement to R.T. Fisher and that Defendants disagreed with the proposed change in placement.

Plaintiff argues that it was not put on notice of this claim because Defendants did not use

35

the word "predetermination" or cite to law asserting predetermination in either Due Process

Complaint and because the above allegations are insufficient to provide sufficient notice.

Whether the allegations set forth above are sufficient to provide notice is a factual determination

that is best left to a jury. Construing the facts in the light most favorable to the nonmoving party

and taking Defendants' allegations as true, as the Court must do at this point in the proceedings,

judgment as a matter of law on this claim is not appropriate.[6]

Turning next to Plaintiff's facility appropriateness argument, Defendants' March 2017

Due Process Complaint has an entire section entitled "Regarding Change of Placement from

WHE to RT Fisher Alternative School (RTF)" in which they explain why they disagree with the

appropriateness of L.D.'s placement at R.T. Fisher. Specifically, Defendants explain that R.T.

Fisher is not an appropriate placement for L.D. because: (1) it uses restraints; (2) there are

children who eat peanut butter every day for lunch and L.D. has a peanut allergy; (3) L.D.

struggles with transitions and a large change encompassing a new school, classroom, staff, and

routine will only increase his behaviors; (4) there is a total lack of inclusion and no opportunity

for L.D. to be included with typically developing peers; and (5) L.D.'s SLP services would be cut

from 4 shorter-duration weekly visits to 2 longer-duration weekly visits, in contravention of the

recommendation of his SLP professional.

In Defendants' June 2017 Due Process Complaint, Defendants note that the school

district scheduled an IEP on March 16, 2017 regarding changing L.D.'s placement to R.T. Fisher,

_____

[6] As an aside, the undersigned notes that while Plaintiff argues that it did not have notice of such claim, the ALJ, in his Final Order, expressly found that, prior to the March 2017 IEP meeting, school staff had decided to place L.D. at R.T. Fisher and that the school staff's pre-determination thwarted A.K. and C.K.'s meaningful participation in the March 2017 IEP meeting. Docket No. 1-2, ¶¶ 20, 21.

which they opposed, and later scheduled another IEP on June 12, 2017 regarding placing L.D. at Guild Elementary which was the new location for the program that had been at R.T. Fisher, which they also opposed.

Plaintiff argues that "facilities" narrowly refers to SCBOE facilities defined as a building or other physical structure of some sort and that because there are no allegations about the condition of SCBOE buildings or other physical structures in the Due Process Complaint, it was not put on sufficient notice about this claim.

With regard to the physical structure, the ALJ's Final Order noted that A.K. and C.K. visited the room at R.T. Fisher and described the building as a "shack," noting that it was a "portable building on R.T. Fisher's campus" whose "physical facility was not well kept and not comparable to the [] regular educational facilities." Docket No. 1-2, ¶ 22. The ALJ also noted that there is no playground at R.T. Fisher, and ultimately found that R.T. Fisher is not a comparable facility to those where non-disabled children are educated. *Id.*, ¶¶ 24, 25. The ALJ further noted that the school district actually moved facilities "from R.T. Fisher to an appropriate physical location at Guild Elementary School," a newer school. *Id.*, ¶ 28.

The heart of Defendants' Due Process Complaints revolves around Plaintiff's denial of a FAPE to L.D. in his then-current placement and Defendants' objection to the appropriateness of Plaintiff's determination to move L.D. to R.T. Fisher. While Defendants did not explicitly include in their Due Process Complaints factual allegations concerning R.T. Fisher's physical structures, construing the facts in the light most favorable to the nonmoving party, a finder of fact could determine that Defendants' allegations regarding why they objected to the placement of L.D. at R.T. Fisher, either singularly or in conjunction with the fact that the school district moved

the school program from R.T. Fisher to a Guild Elementary, a newer facility, were sufficient to

place Plaintiff on notice of this claim. Accordingly, judgment on the pleadings is not warranted.[7]

### 4. Physical Restraint and Isolation

Plaintiff argues that Defendants' claims regarding physical restraint and isolation must

also be dismissed because of lack of subject matter jurisdiction and/or failure to state a claim

upon which relief can be granted due to failure to exhaust. Docket Nos. 42, 43, 49. Specifically,

Plaintiff contends that neither of the Due Process Complaints filed by Defendants at the

administrative level claimed these violations such that Plaintiff was not given fair notice and

Defendants have waived these claims. *Id.*

With regard to Plaintiff's contention that the allegations of Defendants' Due Process

Complaints did not put it not on notice of Defendants' isolation claims and therefore Defendants

failed to exhaust their administrative remedies with respect to isolation, Defendants, in their

March 2017 Due Process Complaint, explicitly stated that L.D. was being isolated in a corner of

the classroom, had little to no interaction with the class, was socially separated, was not receiving

inclusion time, and was restricted is his specials. In their June 2017 Due Process Complaint,

Defendants explicitly stated that, beginning the first week of April, the school district began

assigning various school district personnel to sit with L.D. in his isolated work area. Defendants

---

[7] Because the remainder of Plaintiff's arguments on these claims focus on arguments related to the fact that the gravamen of Defendants' claims are directly related to the provision of a FAPE and therefore require exhaustion, the undersigned's finding that, taking the allegations pled in the light most favorable to the nonmoving party and accepting the allegations as true, Defendants have sufficiently pled facts providing the requisite notice to satisfy exhaustion such that Plaintiff is not entitled to a judgment as a matter of law, appropriately addresses the remainder of Plaintiff's arguments on these claims; a separate discussion is therefore unnecessary.

also noted L.D. had been prohibited from attending related arts classes. Taking these allegations in the light most favorable to Defendants and accepting them as true, a finder of fact could reasonably determine that Plaintiff had sufficient notice regarding Defendants' claims of isolation. Accordingly, Plaintiff is not entitled to a judgment as a matter of law on this claim.

As to Plaintiff's contention that the allegations of Defendants' Due Process Complaints did not put it not on notice of Defendants' restraint claims and therefore Defendants failed to exhaust their administrative remedies with respect to restraint, Defendants, in their March 2017 Due Process Complaint, dedicated an entire paragraph to their non-consent and objection to the use of restraints on L.D. In their June 2017 Due Process Complaint, Defendants noted that the school district added language to L.D.'s IEP which would allow school district personnel to restrain L.D. and they expressly stated that they disagreed with including language that would allow the school district to restrain L.D. As has been discussed, whether the allegations set forth above are sufficient to provide notice is a factual determination that is best left to a jury. Construing the facts in the light most favorable to the nonmoving party and taking Defendants' allegations as true, judgment as a matter of law on Defendants' restraint claim is likewise not appropriate.[8]

---

[8] Because the remainder of Plaintiff's arguments on these claims focus on arguments related to the fact that the gravamen of Defendants' claims are directly related to the provision of a FAPE and therefore require exhaustion, the undersigned's finding that, taking the allegations pled in the light most favorable to the nonmoving party and accepting the allegations as true, Defendants have sufficiently pled facts providing the requisite notice to satisfy exhaustion such that Plaintiff is not entitled to a judgment as a matter of law, appropriately addresses the remainder of Plaintiff's arguments on these claims; a separate discussion is therefore unnecessary.

## 4.  Section 504 and the ADA

Plaintiff argues that Defendants' claims for violations of Section 504 and the ADA must be dismissed for lack of subject matter jurisdiction and/or failure to state a claim upon which relief can be granted due to their failure to exhaust administrative remedies and for failure to bring such claims within the applicable statute of limitations.  Docket No. 42, 43, 49.

Addressing first Plaintiff's claim that Defendants' Section 504 and ADA claims are barred by the statute of limitations because Tennessee's minority-tolling law is inapposite to the facts and circumstances of this case, the undersigned finds Plaintiff's argument unpersuasive. The Section 504 and ADA claims belong to L.D., who is a minor.  Tennessee's minority-tolling law applies; thus, these claims are not time-barred.

Turning to Plaintiff's argument that Defendants' Section 504 and ADA claims must be dismissed for lack of subject matter jurisdiction and/or failure to state a claim upon which relief can be granted due to their failure to exhaust administrative remedies because Defendants' Due Process Complaints did not contain such allegations, although Plaintiff is correct that Defendants did not explicitly cite Section 504 and/or the ADA in their Due Process Complaints, a reasonable finder of fact could find that the allegations pled, as set forth in the recitals above, provided sufficient notice to Plaintiff of Defendants' theories to satisfy exhaustion.[9]  Accordingly, Plaintiff

---

[9] Because the remainder of Plaintiff's arguments on these claims focus on arguments related to the fact that the gravamen of Defendants' claims are directly related to the provision of a FAPE and therefore require exhaustion, the undersigned's finding that, taking the allegations pled in the light most favorable to the nonmoving party and accepting the allegations as true, Defendants have sufficiently pled facts providing the requisite notice to satisfy exhaustion such that Plaintiff is not entitled to a judgment as a matter of law, appropriately addresses the remainder of Plaintiff's arguments on these claims; a separate discussion is therefore unnecessary.

is not entitled to judgment as a matter of law on these claims.

## IV.  Conclusion

For the reasons set forth above, the undersigned finds that Defendants' claims regarding the March 2017 IEP are moot, but that the remainder of Defendants' claims should be permitted to proceed at this juncture of the proceedings.  The undersigned therefore recommends that Plaintiff's Motion for Partial Judgment on the Pleadings (Docket No. 42) be GRANTED IN PART and DENIED IN PART.  Specifically, the undersigned recommends that Plaintiff's Motion be granted with respect to Defendants' March 2017 IEP claims, but denied in all other regards.  Because this case involves a minor, the undersigned further recommends that this Report and Recommendation be filed under Seal.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


JEFFERY S. FRENSLEY
United States Magistrate Judge